IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* SARAH FAUCETTE, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No: 1:10CV592 |
| HOSPICE AND PALLIATIVE CARE CENTER OF ALAMANCE-CASWELL, | ) ) ) ) ) | **FILED UNDER SEAL** **DO NOT PLACE IN PRESS BOX** **DO NOT ENTER ON PACER** |
| Defendant. | ) ) | **DEMAND FOR JURY** |

## *QUI TAM* COMPLAINT

Plaintiff-Relator Sarah Faucette, on behalf of herself and the United States

of America, alleges and claims against Defendant Hospice and Palliative Care

Center of Alamance-Caswell (Hospice of Alamance-Caswell or HAC) as follows:

### JURISDICTION AND VENUE

1.      This action arises under the False Claims Act, 31 U.S.C. §§ 3729-33

(the "False Claims Act"). Accordingly, this Court has jurisdiction pursuant to 28

U.S.C. § 1331. Jurisdiction is also authorized by 31 U.S.C. § 3732(a).

2.     Venue lies in this judicial district pursuant to 31 U.S.C. § 3732(a),
because Defendant qualifies to do business in the State of North Carolina, transacts
substantial business in the State of North Carolina, transacts substantial business in
this judicial district, and can be found here.  Additionally, and as described herein,
Defendant committed within this judicial district acts proscribed by 31 U.S.C.
§ 3729.  Specifically, Defendant submitted within this judicial district false claims
for hospice care provided to ineligible patients and submitted false records to get
such claims paid.

## PARTIES

3.     Defendant Hospice of Alamance-Caswell is a Medicare-certified
hospice provider.  Founded in 1980, HAC offers hospice service to patients who
reside in private homes, nursing facilities, assisted living facilities, and hospitals.
As described herein, Plaintiff-Relator has direct, independent knowledge that HAC
fraudulently recruits and bills under the Medicare Hospice benefit for ineligible,
non-terminal patients.

4.     Plaintiff-Relator Sarah Faucette is a registered nurse with over four
years of experience in the hospice industry.  Ms. Faucette was employed by HAC
in 2005.   In the course of her duties, Plaintiff-Relator gained direct, personal
knowledge of HAC's routine, fraudulent practices of recruiting, admitting, and
billing for non-terminal patients.   Ms. Faucette's personal experience has

2

convinced her that HAC's fraudulent conduct represents a widespread, systematic practice endemic to HAC. HAC's fraud offends Ms. Faucette's long-standing dedication to the mission of hospice care and to the needs of terminally-ill patients and causes her to file this Complaint on behalf of herself and the United States as an original-source relator under the *qui tam* provisions of the False Claims Act. Plaintiff-Relator is serving contemporaneously herewith on the United States a statement of the material evidence in her possession upon which her claims are based.

## THE MEDICARE HOSPICE BENEFIT

5.      Defendant's aggressive business model represents an intrusion of greed into an institution founded upon philosophical, spiritual, and medical notions of charity and care-giving. The impetus for the modern hospice movement in the United States is attributed to psychiatrist Dr. Elizabeth Kübler Ross, whose 1969 On Death and Dying is acknowledged to have altered modern perceptions about care for the terminally ill. In the 1970s, U.S. hospices opened their doors as volunteer organizations dedicated to bringing comfort and humanity to terminal patients. Testifying in 1975 before the U.S. Senate Special Sub-committee on Aging, Kübler Ross stated: "We should not institutionalize people. We can give families more help with home care and visiting nurses, giving the families and the patients the spiritual, emotional, and financial help in order to facilitate the final

3

care at home." In 1982, Congress created a provisional Medicare Hospice Benefit, made permanent in 1986. By 1990, 800 hospice companies were caring for 76,491 patients, with an average length of stay of 48.4 days.

6.     From such humble altruistic roots, Hospice has become big business. Medicare hospice payments rose from $205 million in 1989 to $9.2 billion in 2006. In the 1998 article "Hospice Boom Is Giving Rise to New Fraud," the *New York Times* recognized that the hospice infrastructure "was never designed to handle the expanding network of nursing homes, hospices, assisted-care centers and other services popping up to serve the nation's growing aging population." Nevertheless, the Medicare Hospice Benefit has become a potentially unlimited stream of income for those who bring aggressive marketing, sales, and growth tactics into the new industry of care for the dying.

7.     Hospice covers a broad set of palliative services for qualified beneficiaries who have a life expectancy of six months or less as determined by their physician. Hospice is designed to provide pain-relief, comfort, and emotional and spiritual support to patients with a terminal diagnosis. Qualified hospice patients may receive skilled nursing services, medication for pain and symptom control, physical and occupational therapy, counseling, home health aide and homemaker services, short-term inpatient care, inpatient respite care, and other services for the palliation and management of the terminal illness. Qualified

4

beneficiaries who elect the Medicare Hospice Benefit agree to forego curative treatment for their terminal condition.

8.      Through Medicare and/or Medicaid (indirectly through the States), the United States reimburses hospice providers for services to qualified beneficiaries on a *per diem* rate for each day a qualified beneficiary is enrolled. Medicare and/or Medicaid make a daily payment, regardless of the amount of services provided on a given day and even on days when no services are provided.[1] In return for the Hospice *per diem* payment, hospices are obligated to provide patients with all covered palliative services.

## DEFENDANT'S FRAUDULENT SCHEMES

9.      HAC has perpetrated a fraudulent scheme to defraud Medicare and Medicaid by recruiting, certifying, re-certifying, and billing for non-qualifying Hospice patients.

10.     HAC routinely admits non-qualifying patients for Hospice under fraudulent diagnoses unrelated to the patients' actual condition. In fact, HAC pays no heed to Medicare regulations and admits nearly any patient referred to it, regardless of qualification. HAC's mantra, as repeated *ad nauseum* to Plaintiff-Relator and other HAC staff by Director of Nursing Sandra Gibson (Gibson) is:

---

[1] Payments are made according to a fee schedule that has four base payment amounts for the four different categories of care: routine home care (RHC), continuous home care (CHC), in-patient respite care (IRC), and general in-patient care (GIC).

5

"get the consent [hospice election form] signed and put them on for 90 days." In over four years at HAC, Plaintiff-Relator is not aware of a single patient referred to HAC that was not admitted for at least one certification period.

11. HAC's management perpetrates its fraudulent scheme by aggressively enforcing inappropriate practices. For example, in or around February, 2010, HAC admitting nurse Virgie Jollay (Jollay) and social worker Bonnie Moss (Moss) performed an initial assessment visit on a patient, name unknown. The patient was referred to HAC under a diagnosis of "failure to thrive," but the assessment revealed that the patient had lost only two pounds – not nearly enough to demonstrate the decline required under that diagnosis. Jollay and Moss did not admit the patient. When they reported to Gibson, she ordered them to go back to the patient's house and admit the patient to Hospice. Though not terminal, the patient remained on the HAC rolls for a minimum of 90 days.

12. HAC's practices produce absurd results as well as false claims to the United States for care provided to non-terminal patients. In March, 2010, Gibson sent Plaintiff-Relator to perform a recertification on a patient W.B. W.B. had been diagnosed with a brain tumor but had been in remission for five years. In August, 2009, HAC had admitted W.B. under a diagnosis of "stroke" – even though W.B. had a stroke two years prior and he had no terminal condition whatsoever. When Plaintiff-Relator attempted to perform her recertification visit, she learned that

6

W.B. was not at home – he had gone to dinner at Ruby Tuesday and then for a walk. Plaintiff-Relator informed Gibson that W.B. was not appropriate for Hospice. Nevertheless, Gibson pressured Plaintiff-Relator to recertify W.B. yet again and to falsify chart information to justify a fraudulent diagnosis.

13. The following is merely a representative sample of patients who were not eligible for Hospice but have been billed to Medicare and Medicaid by HAC:

| Patient | Hospice Diagnosis | Clinical and Functional Characteristics in Derogation of Diagnosis |
|---|---|---|
| NU | Failure to Thrive | Patient had lost only two pounds and showed no marked decline. |
| W.B. | Stroke | W.B.'s stroke was 2 years prior. He was not terminal with any present illness or condition. |
| M.W. | Failure to Thrive | M.W. is approximately 6' and weighs 170 lbs. She is capable of walking and eating without assistance. |
| C.M. | Failure to Thrive | On service for over 5 years. |
| B.P. | Failure to Thrive | On service for over 4 years. |
| W.C. | "acute m.i." | There is no hospice diagnosis for heart attack. W.C. meets none of the criteria for admission under heart disease; W.C. does not take a single heart medication or vasodilator. |

14. By and through all of the circumstances described *supra*, HAC has undermined the noble intention and mission of Hospice, defrauded the United States, and jeopardized the already overly-strained Medicare program.

7

## COUNT ONE
## FALSE CLAIMS UNDER 31 U.S.C. § 3729[2]

15.    Plaintiff-Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

16.    By and through the fraudulent schemes described herein, Defendant knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information –  presented or caused to be presented false or fraudulent claims to the United States for payment or approval and knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim or to get a false or fraudulent claim paid or approved by the United States, to wit:

(a)    false claims for Hospice care provided to patients whom Defendant knew did not meet Medicare or Medicaid requirements for Hospice;

(b)    false patient records intended to get such claims paid;

(c)    false certifications regarding past, present, or future compliance with a prerequisite for payment or reimbursement by the United States through Medicare or Medicaid, when Defendant was aware that its practices with regard to patient

---

[2]    On May 20, 2009, the President of the United States signed the Fraud Enforcement and Recovery Act of 2009, amending the False Claims Act as set forth in 31 U.S.C. §§ 3729-3733. Defendant's fraudulent actions described herein implicate both the prior and amended statutory provisions and subject it to treble damages and penalties as set forth in the respective versions of the False Claims Act.

8

admissions and revocations, described *supra*, were in violation of Medicare regulations;

(d) false claims for Hospice services premised upon Defendant's fraudulent certifications of compliance;

17. The United States paid the false claims described herein and summarized in paragraph 16(a)-(d).

18. Defendant's fraudulent actions, as described *supra*, are part of a widespread, systematic pattern and practice of knowingly submitting or causing to be submitted false claims to the United States through fraudulent certification and re-certification of Hospice patients and fraudulent billing of the United States through Medicare and Medicaid.

19. Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendant by the United States through Medicare and Medicaid for such false or fraudulent claims for Hospice services.

## COUNT TWO
## 31 U.S.C. § 3729(a)(3)
## CONSPIRACY

20. Plaintiff-Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

9

21.     Defendant knowingly presented, or caused to be presented, to an officer or employee of the United States Government, false or fraudulent claims for payment or approval, to-wit: Defendant knowingly certified and/or re-certified Hospice patients whom it knew did not qualify for Medicare or Medicaid reimbursement and presented or caused to be presented false claims to the United States through Medicare or Medicaid for payment of same.

22.     The United States paid Defendant and the State of North Carolina through the Medicaid program for such false claims.

23.     Defendant, in concert with its principals, agents, employees, subsidiaries, and other institutions did agree to submit such false claims to the United States.

24.     Defendant and its principals, agents, and employees acted, by and through the conduct described *supra*, with the intent to defraud the United States by submitting, or causing to be submitted, false claims for payment to the United States through Medicare or Medicaid.

25.     Defendant's fraudulent actions, together with the fraudulent actions of its principals, agents and employees, have resulted in damage to the United States equal to the amount paid by the United States to Defendant and others as a result of Defendant's fraudulent claims.

10

## COUNT THREE
## SUPPRESSION, FRAUD, AND DECEIT

26.    Plaintiff-Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

27.    Defendant misrepresented or suppressed the material fact that a substantial number of its patients enrolled in Hospice do not qualify for Hospice and are not terminally ill.

28.    Defendant was legally obligated to communicate to these facts to the United States.

29.    Such misrepresentations were made willfully to deceive or recklessly without knowledge.

30.    The United States acted on Defendant's material misrepresentations described herein to its detriment.

31.    Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid by the United States to Defendant and others as a result of Defendant's fraudulent claims.

## JURY DEMAND

Plaintiff-Relator hereby demands a trial by struck jury on all issues so triable.

11

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff-Relator respectfully prays that this Court:

1.    Render judgment in favor of Plaintiff-Relator on behalf of the United States, and against Defendant, on Count One in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Plaintiff-Relator may be entitled;

2.    Render judgment in favor of Plaintiff-Relator on behalf of the United States, and against Defendant, on Count Two in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees, costs, interest, and such other, different, or further relief to which Plaintiff-Relator may be entitled;

3.    Render judgment in favor of Plaintiff-Relator on behalf of the United States, and against Defendant, on Count Three pursuant to 31 U.S.C. § 3732 and North Carolina law in an amount sufficient to compensate the United States for Defendant's fraud, suppression, and deceit, together with punitive damages in an amount calculated to deter Defendant from engaging in such conduct in the future, along with attorneys' fees, costs, interest, and any other, further, or different relief to which Plaintiff-Relator may be entitled; and

4.    Grant such other relief as this Court may deem just and proper.

12

Date: July 29, 2010.

FROHSIN & BARGER LLC

/s/ Henry I Frohsin
Henry I Frohsin (Pro Hac Vice)
James F. Barger, Jr. (Pro Hac Vice)
J. Elliott Walthall (Pro Hac Vice)
One Highland Place
2151 Highland Avenue, Suite 310
Birmingham, Alabama 35205
Telephone: (205) 933-4006
Facsimile: (205) 933-4008
Henry@frohsinbarger.com
jim@frohsinbarger.com
elliott@frohsinbarger.com

WOOD JACKSON PLLC

/s/ J. Gary Eichelberger, Jr.
J. Gary Eichelberger, Jr.
NC State Bar No. 37633
W. Swain Wood
N. C. Bar No. 32037
J. Christopher Jackson
N. C. Bar No. 26916
301 Glenwood Ave, Suite 280
Raleigh, North Carolina 27603
Telephone: (919) 829-7394
Facsimile: (919) 829-7396
geichelberger@woodjacksonlaw.com
swood@woodjacksonlaw.com
cjackson@woodjacksonlaw.com

Attorneys for Plaintiff-Relator Sarah Faucette

13

## CERTIFICATE OF SERVICE

On this the 30th day of July, 2010, counsel for Plaintiff-Relator hereby

certifies that in compliance with Rule 4 of the Federal Rules of Civil Procedure,

service of the *Qui Tam* Complaint has been executed as follows:

**By Certified Mail/Return Receipt to:**

Anna Mills S. Wagoner, United States Attorney
Office of the Attorney General
101 South Edgeworth Street, 4th Floor
Greensboro, NC 27401

Attorney General of the United States of America
Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

/s/ J. Gary Eichelberger, Jr.
J. Gary Eichelberger, Jr.
NC State Bar No. 37633
301 Glenwood Ave, Suite 280
Raleigh, North Carolina 27603
Telephone: (919) 829-7394
Facsimile:  (919) 829-7396
geichelberger@woodjacksonlaw.com

14